FILED'11 APR 21 10:09USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

SUZANNE MILES,

Civil No. 09-699-CL

Petitioner,

**REPORT AND RECOMMENDATION**

v.

NANCY HOWTON,

Respondent.

CLARKE, Magistrate Judge.

Petitioner Suzanne Miles is a state prisoner who is represented by counsel in this 28

U.S.C. § 2254 federal habeas petition. She challenges her January 2002 conviction for murder

and resulting sentence. In her September 16, 2009, amended habeas petition (#18), petitioner

raises two claims for relief: (1) ineffective assistance of appellate counsel in violation of the

Fourteenth Amendment,[1] and (2) deprivation of her right to present a defense in violation of the

Sixth and Fourteenth Amendments. For the reasons advanced below, the court concludes that

---

[1] The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant
the effective assistance of counsel on her first appeal as of right. *See* Evitts v. Lucey, 469 U.S.
387, 391-405, 105 S.Ct. 830 (1985).

Page 1 - REPORT AND RECOMMENDATION

petitioner has not shown that she is entitled to federal habeas corpus relief, and recommends that petitioner's amended petition be denied and this case dismissed.

## BACKGROUND

On February 29, 2000, petitioner walked into her husband's place of work and shot him twice, first in the chest, then in the back of the head, fatally wounding him.  (T. Tr. at 60-62).[2] She then drove to the Silverton Police Department and confessed to the killing.  (Id. at 10-12). On March 8, 2000, petitioner was indicted on one charge each of murder with a firearm and unlawful use of a weapon with a firearm.  (Resp. Ex. 102).

On November 15, 2001, petitioner waived her right to a trial by jury.  (11/15/01 PTH Tr. at 1-3).[3]  On December 17, 2001, the trial court held a pre-trial hearing on the state's motion *in limine* to suppress petitioner's expert evidence regarding her use of Paxil and its effect on her emotional state ("the Paxil evidence"), which she proposed to offer in support of her extreme emotional disturbance ("EED") defense.  (12/17/01 PTH Tr. at 1-61).[4]  EED is an affirmative defense to intentional murder under Oregon law.  OR. REV. STAT. § 163.115(1)(a).  A successful EED defense reduces intentional murder to first degree manslaughter.  OR. REV. STAT. § 163.118.

---

[2] Citations to "T. Tr." refer to the page(s) indicated in the official transcript of the January 7, 2002, trial proceedings included in the Transcript Designation (#12) filed with Respondent's Response to Habeas Petition (#13) and Answer (#14).

[3] The trial court held two pre-trial hearings, on November 15 and December 17 of 2001. For the purposes of this opinion, the transcripts for these proceedings are identified, respectively, as "11/15/01 PTH Tr." and "12/17/01 PTH Tr."

[4] The transcript of the December 17, 2001, pre-trial hearing ("12/17/01 PTH Tr.") is oddly paginated; the page breaks in the transcript designation do not align with the page breaks in the transcription of the proceedings.  For the purposes of this opinion, references to this transcript will identify the page of the transcript designation, not the original page numbers of the transcription of the proceedings.

The court heard testimony from Dr. Robert Julien, M.D., Ph.D., a licensed anesthesiologist practicing at St. Vincent's hospital who holds a doctoral degree in pharmacology and has past experience as an assistant professor of medical pharmacology at the University of California at Irvine, and as an assistant professor of pharmacology and anesthesiology at Oregon Health Sciences University. (12/17/01 PTH Tr. at 3). By letter opinion dated December 21, 2001, the trial court granted the state's motion and excluded the Paxil evidence, finding it inadmissible under OEC 702, 401, and 403, for failure satisfy the threshold admissibility requirement standard for scientific evidence set by State v. Brown, 297 Or. 404, 687 P.2d 751 (1984).[5]  (Resp. Ex. 118).

On January 17, 2002, petitioner was convicted of murder[6] in a bench trial in Marion County Circuit Court, Case No. 00C42115, and sentenced to life imprisonment, for a minimum of twenty-five years without possibility of parole. (Resp. Ex. 101).

Petitioner directly appealed her conviction to the Oregon Court of Appeals. The Oregon Court of Appeals affirmed without opinion, State v. Miles, 191 Or. App. 654 (2004), and the Oregon Supreme Court denied review, State v. Miles, 337 Or. 34 (2004).

Petitioner, represented by counsel, filed a petition for post-conviction relief in Washington County Circuit Court, C04-1765CV. (Resp. Ex. 108). The post-conviction court denied relief. (Resp. Ex. 125-26). Petitioner appealed the denial to the Oregon Court of

---

[5] The trial court found the Brown to be consistent with the federal standard for scientific evidence set by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

[6] Petitioner was convicted of one count each of murder with a firearm and unlawful use of a weapon with a firearm. (Resp. Ex. 102 at 2-5). However, petitioner does not challenge her conviction on the charge of unlawful use of a weapon.

Page 3 - REPORT AND RECOMMENDATION

Appeals. (Resp. Ex. 127). The Court of Appeals affirmed without opinion, Miles v. Hoefel, 221

Or. App. 383 (2008), and the Oregon Supreme Court denied review, Miles v. Hoefel, 345 Or.

301 (2008).

## DISCUSSION

In her amended habeas petition, petitioner raises the following claims for relief:

1.    Petitioner alleges she was deprived of her right to the effective assistance
      of appellate counsel by the failure of her appellate counsel to appeal the
      trial court's exclusion of the Paxil evidence.

2.    Petitioner alleges that by excluding the Paxil evidence, the trial court
      deprived her of her right to present witnesses and evidence in support of
      her defense, therefore her conviction was obtained in violation of her Sixth
      and Fourteenth Amendment rights.

(Am. Pet. at 3). Respondent moves to dismiss (#38) petitioner's habeas application on grounds

that the petition is barred by a state court determination on the merits that is entitled to deference,

and by procedural default. The court addresses each claim in turn, below.

## I. Ground One

Petitioner argues she is entitled to habeas relief because the state post-conviction court's

determination that her ineffective assistance of appellate counsel claim lacked merit was

objectively unreasonable. Respondent counters that (1) petitioner's claim for ineffective

assistance of appellate counsel was denied on the merits in a state court decision entitled to

deference; and (2) even under *de novo* review, the claim fails because (a) the Paxil evidence was

properly excluded under Oregon law, therefore the failure of petitioner's appellate counsel to

object to its exclusion does not constitute deficient performance, and (b) even assuming it was

admissible, petitioner cannot show prejudice because no reasonable factfinder considering the

Paxil evidence would have reached a result different from the one reached by the trial court.

Page 4 - REPORT AND RECOMMENDATION

A.    **Standard**

1. **Relief on the Merits**

The statutory authority of federal courts to issue habeas corpus relief for persons in state

custody is defined by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA").  Where a claim has been adjudicated on the merits in a state

court proceeding, an application for writ of habeas corpus shall not be granted unless

adjudication of the claim in state court resulted in a decision that was:  (1) "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Petitioner's claim for relief is governed by § 2254(d)(1), which "permit[s] relitigation

where the earlier state decision resulted from an 'unreasonable application of' clearly established

federal law."  Harrington v. Richter, -- U.S. --, --, 131 S.Ct. 770, 785 (2011).  The "clearly

established federal law" applicable to petitioner's claim consists of the rules for determining

when a criminal defendant has received constitutionally inadequate assistance of counsel in

violation of the Sixth Amendment.

2. **Ineffective Assistance of Counsel:  Strickland v. Washington**

The clearly established federal law governing claims of ineffective assistance of appellate

counsel is Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). *See* Smith v.

Robbins, 528 U.S. 259, 285, 120 S.Ct. 746 (2000) (*citing* Smith v. Murray, 477 U.S. 527, 535-

36, 106 S.Ct. 2661 (1986)).  To establish ineffective assistance of counsel "a defendant must

show both deficient performance by counsel and prejudice."  Strickland, 466 U.S. at 687.  To

Page 5 - REPORT AND RECOMMENDATION

establish deficient performance, a petitioner must show that her "counsel's performance fell

below an objective standard of reasonableness." Id. at 688.  To show prejudice, the petitioner

must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different."  Id. at 694.  "The difference between Strickland's

prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest

case."  Harrington v. Richter, -- U.S. --, --, 131 S.Ct. 770, 792 (2011) (*citing* Strickland, 466 U.S.

at 693, 697) (internal quotation marks omitted).  "The likelihood of a different result must be

substantial, not just conceivable."  Id.

### 3.  Strickland in relationship to the AEDPA

"A doubly deferential standard of judicial review applies to a Strickland claim evaluated

under the § 2254(d)(1) standard."  Knowles v. Mirzayance, 556 U.S. --, --. 129 S.Ct. 1411, 1420

(2009) (*citing* Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S.Ct. 1 (2003) (per curiam)).  The

issue of whether a state court's application of the Strickland standard was unreasonable is not the

same as the issue of whether counsel's performance fell below the Strickland standard.  Richter,

131 S.Ct. at 785.  "For purposes of § 2254(d)(1), 'the issue is not whether the state court

*incorrectly* applied federal law, but whether the state court *reasonably* applied federal law'".  Id.

(*quoting* Williams v. Taylor, 529 U.S. 362, 410, 120 S.Ct. 1495 (2000)) (emphasis in original).

The "state court must be granted a deference and latitude that are not in operation when the case

involves review under the Strickland standard itself."  Id.  The question is not whether the federal

habeas court would reach a different result under *de novo* review, but whether "fairminded

jurists" could disagree on the correctness of the state court's decision.  Id. at 786 (*citing*

Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)); *see also* Lockyer v.

Andrade, 538 U.S. 63, 71, 123 S.Ct. 1166 (2003) (federal habeas court need not review the state

court decision *de novo* before applying the AEDPA standard of review because "the only

question that matters under § 2254(d)(1) [is] whether a state court decision is contrary to, or

involved an unreasonable application of, clearly established federal law."). This standard is

meant to be difficult to meet. Id. at 786; *see also* Schriro v. Landrigan, 550 U.S. 465, 473, 127

S.Ct. 1933 (2007) (AEDPA deference standard is a substantially higher threshold than *de novo*

review under Strickland).

### B.    Petitioner's Claim Is Subject to the AEDPA Standard of Review

Petitioner argues that the post-conviction court's decision denying habeas relief did not

specifically address her claims regarding ineffective assistance of appellate counsel, therefore,

this court is required to perform an independent review of her claims.  (Pl. Brief iso Am. Pet. at

pp. 24; Sur-reply, #44, pp. 2).

Petitioner's argument is precluded by Harrington v. Richter.  There, the Supreme Court

was required to decide "whether § 2254(d) applies when a state court's order is unaccompanied

by an opinion explaining the reasons relief has been denied."  Richter, -- U.S. at --, 131 S.Ct. at

784.  Noting that§ 2254(d) refers only to a "decision" which resulted from an "adjudication," and

that nothing in the text of the statute requires a statement of reasons, the Court concluded that a

habeas petitioner's burden to show there is no reasonable basis for the state court to deny relief is

unaffected by the absence of an opinion explaining the state court's decision.  Id.  The state court

need not even identify which element it finds insufficient, "for § 2254(d) applies when a 'claim,'

not a component of one, has been adjudicated."  Id.  Federal claims presented to a state court are

subject to a rebuttable presumption that they are adjudicated on the merits absent any indication

Page 7 - REPORT AND RECOMMENDATION

or state law principles to the contrary. Id. at 784-85. Accordingly, the Court held that "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits.'" Id. at 785.

Petitioner's ineffective assistance of appellate counsel was submitted to the state post-conviction relief court ("the PCR court"). The PCR court had before it the full record of plaintiff's case, including the state's motion to exclude the Paxil evidence and petitioner's response in opposition, the transcript from the December 17 pretrial hearing, the trial court's letter opinion granting the state's motion, and the transcript from plaintiff's trial. The PCR court denied the petition for post-conviction relief by letter opinion dated June 6, 2005, which reads in its entirety:

> "I have reviewed the voluminous record in [petitioner's post-conviction relief petition]. I find that Ms. Miles has failed to prove any grounds for post conviction relief. Therefore, I deny her petition. I ask that [the Attorney General's Office] prepare the judgment."

(Resp. Ex. 125). Plaintiff has offered no evidence to rebut the presumption that her ineffective assistance of appellate counsel was decided on the merits by the PCR court. Therefore, the AEDPA's deferential standard of review applies.

### C.    Petitioner Is Not Entitled to Habeas Relief Under Ground One

The PCR court's denial of petitioner's ineffective assistance of appellate counsel claim is entitled to deference because it is not an unreasonable application of Strickland. The question for this court is not whether appellate counsel's actions were reasonable, but whether there is any reasonable argument that appellate counsel satisfied Strickland's deferential standard. Richter, 131 S.Ct. at 788.

//

### 1. The PCR Court Could Reasonably Find That Petitioner's Appellate Counsel's Performance Was Not Deficient

Petitioner argues that her appellate counsel's performance was deficient because (1) he appealed the trial court's denial of her motion for judgment of acquittal, which she contends was not a viable claim on appeal; (2) he failed to appeal the trial court's exclusion of the Paxil evidence, which petitioner contends was both meritorious and the single most critical issue in her case; and (3) his decision not to appeal the exclusion of the Paxil evidence cannot be attributed to strategic winnowing of claims because appellate counsel failed to request and review the transcript for the pretrial hearing where the issue was decided. The court addresses each argument in turn.

### (a) Appeal of the Denial of the Motion for Judgment of Acquittal

Petitioner argues there was no legal basis for appellate counsel to assign error to the trial court's denial of petitioner's motion for judgment of acquittal, because she admitted to shooting and killing her husband. (Pet'r's Br. iso Am. Pet., pp. 22). The court disagrees.

The motion for judgment of acquittal was made as follows:

"[Petitioner's Trial Counsel]: Your Honor, before I put on my first witness, I'd like to make a motion for judgment of acquittal. With respect to that motion, I don't think the State has put on evidence that would persuade a reasonable juror that Ms. Miles intentionally murdered her husband. In fact, it is my belief that, through the State's own expert, Dr. Hulteng, we've actually established the affirmative defense of extreme emotional disturbance.

[The Court]: Viewing the evidence in the light most favorable to the State, which I must do at this stage of the proceedings, your motion for judgment of acquittal on the charge of murder is denied."

(Id. at 7) (*citing* T. Tr., Vol. IV, pp. 392).

On appeal, petitioner's appellate counsel did not argue that petitioner should be acquitted

of killing her husband. Rather, appellate counsel argued that petitioner had proved she was suffering from an extreme emotional disturbance at the time of the shooting, rendering her incapable of forming the intent to commit murder and guilty only of first degree manslaughter.[7] (Resp. Ex. 103, Appellant's Br. on Direct Appeal, pp. 3). Petitioner's appellate counsel urged the Oregon Court of Appeals to vacate her murder conviction, enter a conviction for first degree manslaughter, and remand for resentencing on the manslaughter conviction. (Id. at pp. 12).

In its responding brief, the state argued petitioner's argument improperly conflated two distinct legal questions: (1) whether the trial court erred by denying petitioner's motion for judgment of acquittal; and (2) whether the petitioner had borne her burden of proof on the EED affirmative defense and should therefore have been found guilty of first degree manslaughter instead of murder. (Resp. Ex. 104, Resp. Br. on Direct Appeal, pp. 21). The state conceded that both legal issues were preserved and separately briefed it's opposition to each motion.

### (i) The murder conviction

The disputed issue on plaintiff's murder claim was intent. The evidence at trial established that petitioner's relationship with her husband was volatile and they were separated at the time of the shooting. Petitioner received inconsistent messages from her husband regarding his intent to reconcile with her. On February 28, 2000, the day before the shooting, petitioner purchased a handgun and ammunition. (T. Tr. Vol. I, pp. 30-33; 76-77; 84-87; 90-95). That

---

[7] The issue of intent is not a point of distinction in the two crimes; murder and first degree manslaughter are both acts of intentional criminal homicide. Or. Rev. Stat. § 163.115(1)(a) (intentional criminal homicide constitutes murder unless committed under the influence of EED); State v. Gaynor, 130 Or. App. 99, 105, 880 P.2d 947 (1994), *rev. denied*, 320 Or. 508 (1995) (EED does not negate the intent element of murder; it is merely a mitigating factor reducing murder to first degree manslaughter).

night, she attempted unsuccessfully to load the gun. (T. Tr. Vol. IV, pp. 422). Petitioner planned

to threaten suicide in front of the victim in the hopes that he would rescue both her and their

relationship. (T. Tr. Vol. V, pp. 576). On February 29, 2000, petitioner's husband called her at

work and told her that he had filed for divorce, news which visibly and significantly upset her.

(T. Tr. Vol. I, pp. 100-04; Vol. IV, pp. 424). Petitioner left work and encountered her husband

on the road on the way home. An argument ensued, followed by a second argument after the

couple arrived home. Petitioner's husband returned to his work and petitioner drove to a park,

where she loaded the handgun and contemplated suicide. (T. Tr. Vol. IV, 426). The gun

discharged in the car. Petitioner then drove to the victim's place of work, where a third argument

ensued. Shortly after the argument, petitioner retrieved the handgun, carried it concealed in a

paper bag into the victim's place of work, located him in his office and shot him twice, first in the

chest, then again in the back of the head.

Testimony by the state's expert witness, Dr. Richard Hulteng, Ph.D., and by petitioner's

experts, Dr. Stephen Scherr, Ph.D., and Dr. Richard Kolbell, Ph.D., established that petitioner's

account of what happened the day of the shooting varied over time. At first, petitioner reported

that she confronted her husband in his office with the intent to commit or threaten to commit

suicide and the gun discharged accidentally as she raised it. (T. Tr. Vol. III, pp. 278-79, 290-91;

Vol. IV. pp. 428; Vol. V, pp. 586-87). In a subsequent interview with Dr. Scherr, petitioner

acknowledged that she shot her husband intentionally, not accidentally. (T. Tr. Vol. IV, 429,

452-53). And in subsequent interviews with Drs. Hulteng and Kolbell, petitioner reported that,

in addition to feeling helpless and hopeless over the impending end to her marriage, she felt pain

and a growing sense of anger towards her husband, that she entered his office with the intent to

shoot him, to make him hurt like she was hurting and to make him stop hurting her. (T. Tr. Vol. III, pp. 301-04; Vol. V, pp. 593-94). Petitioner admitted that she knew the second shot would kill her husband. (T. Tr., Vol. III, pp. 306). Circumstantial evidence supported the conclusion that petitioner had to manually clear a jammed round from the chamber of the gun between the first, non-fatal shot to the chest and the second, fatal shot to the back of the head. (T. Tr. Vol. II, pp. 230-33). Other evidence established that petitioner had past experience with firearms and in particular had past experience using the make and model firearm as she used to shoot her husband, and that she had in the past threatened a boyfriend by firing a rifle into the ground. (T. Tr. Vol. II, pp. 190-93). The trial court found that a question of fact existed as to when petitioner formed the intent to kill her husband, but found that the killing was intentional and deliberate based on the location of the fatal shot. (T. Tr. Vol. VII, pp. 812, 814).

Although the likelihood that petitioner could successfully appeal the issue of intent may have been low, had appellate counsel prevailed in this argument, he would have secured an acquittal for his client. Petitioner could not have been guilty of either murder or first degree manslaughter because both crimes are forms of intentional homicide. Therefore, while the chance of success may have been virtually nonexistent, the potential benefit to petitioner was substantial. On these facts, the PCR court could reasonably find that appellate counsel's decision to raise this issue on appeal was a reasoned, strategic choice by appellate counsel and not an indicator of deficient performance.

### (ii) The EED defense

The issue regarding petitioner's EED defense was whether she had proved the second element: whether a reasonable person with petitioner's personal characteristics, acting under the

circumstances as petitioner believed them to be, would lose the capacity to control themselves such that they would be unable to forgo committing homicide.

The evidence at trial established that petitioner and her husband had a rocky relationship and had separated several times. (T. Tr. Vol. III, pp. 293). Petitioner once obtained a restraining order against her husband; however, evidence was introduced showing that petitioner admitted she obtained the restraining order by intentionally and falsely reporting that her husband physically abused her. (T. Tr. Vol. V, pp. 691-96). At the time of the shooting, petitioner and her husband were separated, although they were living in the same house. (T. Tr. Vol. III, pp. 293-94). During this separation, petitioner's husband repeatedly gave petitioner conflicting signals regarding whether he intended to reconcile with her. Petitioner had been pre-approved for a loan and was actively searching for a new home. Petitioner suspected her husband was being unfaithful, and although she initially denied it, circumstantial evidence and petitioner's subsequent accounts of the events leading up to the shooting supported the conclusion that petitioner knew her husband was having an affair and who he was having it with when she shot him. (Id. at pp. 299-300). Evidence regarding the impact of these circumstances on petitioner's emotional state was primarily introduced through the expert testimony of Drs. Scherr and Kolbell for petitioner, and Dr. Hulteng for the state.

### Dr. Scherr

Dr. Scherr diagnosed petitioner as suffering from post traumatic stress disorder ("PTSD"); major depressive disorder; recurrent generalized anxiety disorder; and a borderline personality disorder with dependent and avoidant features. (T. Tr. Vol. IV, pp. 435). Dr. Scherr noted petitioner's history of unstable and abusive interpersonal relationships, often fueled by alcohol

and sometimes substance abuse, starting with her parents and siblings and continuing in her own intimate relationships. (Id. at pp. 410-13). He noted that petitioner reported her husband had physically abused her and that she had obtained a restraining order against him for that reason. (Id. at 418-19). Dr. Scherr observed that friends, relatives, and acquaintances described petitioner as being "depressed, psychotic, weird, moody, possessive, jealous, and at times verbally abusive" in the days leading up to the shooting. (Id. at 413-14). He noted petitioner's self-reported suicidal ideation in the weeks immediately preceding the shooting. (Id. at 415-16). He acknowledged that some of the results from tests he administered indicated that petitioner was answering in a manner she believed to be socially desirable rather than factually accurate, thereby rendering the test results invalid. (Id. at pp. 431-33).

Dr. Scherr opined that the combination of petitioner's depression, anxiety, and PTSD rendered her particularly vulnerable to rapid decompensation. (Id. at pp. 446). He further opined that there was clear evidence that petitioner had been decompensating in the three to four weeks leading up to the shooting, and that, in his opinion, she was not in control of herself when she shot her husband. (Id. at pp. 448-50). When pressed on cross-examination, Dr. Scherr opined that petitioner's changing account of what happened on the day of the shooting could be attributed to lies, forgetfulness, or repression, but declined to offer an opinion on which possibility was the most likely answer. (Id. at pp. 457-58). He admitted he was skeptical of petitioner's first account describing the shooting as accidental, and that he knew she either could not, or would not, give him the full account, but testified that even so, he accepted her statement that this account was what she remembered. (Id. at pp. 461-65).

//

Page 14 - REPORT AND RECOMMENDATION

### Dr. Kolbell

Dr. Kolbell diagnosed petitioner as suffering from a major depressive disorder, chronic and recurrent, (T. Tr. Vol. V, pp. 600), generalized anxiety disorder, (id at pp. 602), and borderline personality disorder, (id. at pp. 603). Like Dr. Scherr, Dr. Kolbell noted petitioner's history of chaotic and abusive interpersonal relationships. (Id. at 571). He opined that the mixed messages petitioner received from her husband in the weeks leading up to the shooting intensified her depression, (id. at 570), as evidenced by her proclaimed plan to attempt suicide in order to prompt her husband to save her, which Dr. Kolbell opined was indicative of both extraordinary depression and "somewhat impaired" judgment and reasoning, (id. at pp. 576-77), and that petitioner felt hostility towards her husband, (id. at pp. 578). Dr. Kolbell acknowledged that petitioner's initial and final accounts of the day of the shooting varied significantly in several ways: first, in her initial denial and subsequent admission that she knew her husband was having an affair and her strong suspicion, if not outright admission, that she knew who the woman was; second, in her initial representation that the shooting was accidental and subsequent admission that she intended to shoot her husband; and third, the emphasis which petitioner placed on her emotional distress and the factors leading up to the shooting. (Id. at pp. 588). Dr. Kolbell distinguished between deceitfulness, which he described as the conscious, thought out plan to lie or distort the truth, and simple forgetfulness, which he described as a "normal protective mechanism" encompassing both denial and inaccurate recall. (Id. at pp. 595). He opined that petitioner did not demonstrate any evidence of memory impairment, and therefore attributed the variations in her accounts to her initial denial of what she had done and subsequent realization of what she had done as the denial mechanism broke down. (Id. at pp. 599). Ultimately, Dr.

Page 15 - REPORT AND RECOMMENDATION

Kolbell opined that petitioner was unable to control herself on the day of the shooting. (Id. at pp. 604).

On cross-examination, Dr. Kolbell stated he had not evaluated petitioner for PTSD and therefore could not disagree with Dr. Scherr's diagnosis of PTSD, but further stated that he did not see, and petitioner did not report, any symptoms suggestive of PTSD, and that in his opinion her presentation was more consistent with a generalized anxiety disorder. (Id. at pp. 628). Regarding her changing accounts of the day of the shooting, Dr. Kolbell acknowledged that petitioner's statements varied in some significant ways over time, but maintained that, in his opinion, her statements were accurate according to what she remembered at the time that she made them. (Id. at pp. 633). He acknowledged that, as a result, he was unable to say with any degree of certainty whether her statements at any given time were actually accurate or simply her recollection at the time, and specifically could offer no opinion on whether her last statement acknowledging that she intentionally shot her husband was truthful other than to comment that it was more incriminating than her initial statement. (Id. at pp. 642-43).

### Dr. Hulteng

The state's expert, Dr. Hulteng, diagnosed petitioner as suffering from alcohol abuse; adjustment disorder with mood and conduct disturbance; and borderline personality disorder with antisocial and dependent features. (T. Tr. Vol. III, pp. 311, 314). He found that at the time of her initial account of the accidental shooting, petitioner may have been in denial about her anger towards her husband, but was not, in his opinion, in denial about what happened. (Id. at pp. 318). Dr. Hulteng conceded that he had not been provided with and therefore had not reviewed a number of petitioner's medical records at the time he rendered his diagnosis of petitioner. (Id. at

Page 16 - REPORT AND RECOMMENDATION

pp. 323-25). However, he was aware of her allegations of past physical and emotional abuse at the hands of her parents, siblings, and past intimate relationships, which he agreed was important to petitioner's potential psychological vulnerability, particularly with respect to fears of abandonment and difficulties managing anger, and maintained that his diagnosis accounted for this history. (Id. at pp. 328-34). He opined that petitioner was better diagnosed with generalized anxiety than PTSD due to the generalized, rather than traumatically focused, nature of her anxiety. (Id. at pp. 345-46). Furthermore, while he would not "quibble with a diagnosis of a major depressive disorder, recurrent," (id. at pp. 352), in his opinion the diagnosis of borderline personality disorder best captured what he observed in petitioner, (id. at pp. 357). He found petitioner capable of deceit, indifferent to the rights and feelings of others, and prone to seeing herself as being victimized. (Id. at pp. 369).

In the state's rebuttal case, Dr. Hulteng distinguished between dissociation, which he characterized as a disruption or distortion of reality, and psychosis, which he characterized as a break with reality. (T. Tr. Vol. VI, pp. 718). Specifically, he opined that the fact that a person experienced dissociation would not, in and of itself, lead him to the conclusion that the person was not or could not be in control of themselves. (Id. at pp. 719). Dr. Hulteng specifically opined that nothing in petitioner's description of the dissociation accompanying her second version of events, when she acknowledge that she intentionally shot her husband, would lead him to the conclusion that she was not in control of herself at that time. (Id.). Dr. Hulteng further opined that petitioner's varying accounts of what happened on the day of the shooting could not be attributed solely to repression or dissociative amnesia, due to the high degree of detail in her initial account and his strong impression during his initial interview, based on petitioner's

Page 17 - REPORT AND RECOMMENDATION

conduct and statements, that she was withholding information and actively debating whether to tell him the full story. (Id. at pp. 720-21). Rather, he opined that once he confronted her and she came to understand that her initial account of the shooting was factually implausible, petitioner shifted the emphasis of her account, from shooting being accidental to being intentional but done under emotional distress, and added details she had not previously supplied. (Id at. pp. 721). However, his initial impression remained the same: that petitioner's first account created an exculpatory explanation in partly emphasis, partly by tone, partly by distortion, and partly by fabrication. (Id. at pp. 741). He affirmed his opinion that while petitioner had been very upset at the time of the shooting, her behavior that day demonstrated that she executed "a fairly lengthy sequence of behaviors--that appeared organized and goal directed," that she described herself as acting with a motive to kill herself and her husband, and while she did not carry out that motive completely, "she was certainly capable of organizing her behavior around it." (Id. at pp. 718-19).

### The Trial Court's Conclusion

The trial court found that petitioner suffered from a chronic and recurring major depressive disorder, a generalized anxiety disorder, and a borderline personality disorder, but specifically rejected Dr. Scherr's diagnosis of PTSD. (T. Tr. Vol. VII, pp. 814-15). The court further found that the news that her husband had taken legal action towards divorce was sufficient to cause petitioner an extreme emotional disturbance given her "fragile psychological makeup," therefore she had proved the first element of her EED defense. (Id. at pp. 815-16). The court further found that the extreme emotional disturbance was not the result of petitioner's own "intentional, knowing, or criminally reckless act," therefore she had proved the third element of her EED defense. (Id. at pp. 816-17). However, the court found that petitioner failed to prove

Page 18 - REPORT AND RECOMMENDATION

the second element of her EED defense because, taking into account petitioner's personal

characteristics (age, sex, cultural background, physical stature, and mental and physical

handicaps), a reasonable person would not have lost the capacity to control herself upon

receiving the news that her husband was divorcing her. (Id. at pp. 817-18). That is, a reasonable

person operating under the circumstances as petitioner believed them to be would have been able

to forgo committing the homicide. (Id. at pp. 818).

### Conclusion

Based on the evidence on which plaintiff's conviction rested, the state PCR court could

reasonably determine that appellate counsel's decision to appeal the trial court's determination

that petitioner had failed to prove the second element of her EED defense had merit. The

evidence at trial consisted largely of expert testimony regarding the psychological impact on

petitioner of certain factual events and the clinical significance of petitioner's changing account

of the shooting. The trial court's finding that petitioner suffered from a chronic and recurring

major depressive disorder, a generalized anxiety disorder, and a borderline personality disorder is

most consistent with Dr. Kolbell's diagnosis. The court further found that, given her "fragile

psychological makeup," petitioner suffered from an extreme emotional disturbance on the day of

the shooting, also consistent with Dr. Kolbell's opinion. Yet the court concluded, consistent with

Dr. Hulteng's opinion, that a reasonable person suffering from the same mental infirmities would

not have lost control of themselves such that they would be unable to forgo homicide upon

learning that their husband intended to divorce them, as petitioner did. The trial court made no

findings of fact as to why it found that a reasonable person would have been able to control

themselves, and offered no explanation for why it adopted Dr. Kolbell's diagnosis but rejected his

Page 19 - REPORT AND RECOMMENDATION

opinion in favor of the opinion of Dr. Hulteng, whose opinion was based on a different diagnosis. Thus, the PCR court could reasonably determine that appellate counsel's decision to raise the issue on appeal had merit, because there were no findings of fact to support the trial court's legal conclusion that petitioner had failed to prove her EED defense.

### (b) Failure to Order the Pretrial Hearing Transcript

Petitioner argues that her appellate counsel's failure to appeal the trial court's exclusion of the Paxil evidence cannot be attributed to strategy, because he did not order the transcript of the pretrial hearing. Implicit in petitioner's argument is the assumption that appellate counsel could not judge the merit of this issue or the likelihood of success on appeal without reading the transcript.

While it appears that petitioner's appellate counsel did not order the transcript, he had access to the trial court's three-page letter opinion explaining its decision, which adequately summarizes Dr. Julien's testimony and the points on which the trial court found the evidence inadmissible. (Resp. Ex. 118). Appellate counsel also had access to the state's motion and supporting memorandum and petitioner's response in opposition. (Resp. Ex. 120). These memoranda set out the factual assertions and authorities on which the parties relied in making their arguments. The PCR court could reasonably conclude that review of these materials adequately informed appellate counsel regarding the merits of petitioner's argument that the trial court erred as a matter of law by excluding the Paxil evidence, such that his decision not to raise the issue on appeal was a strategic decision based on the likelihood of success on appeal.

### (c) Failure to Appeal the Exclusion of the Paxil Evidence

Petitioner argues that her appellate attorney should have challenged the trial court's

exclusion of the Paxil evidence on direct appeal, and that his failure to do so constitutes deficient

performance because the claim was meritorious. (Pet'r's Br. iso Am. Pet. at pp. 14). In support

of her argument that the claim was meritorious, petitioner briefs extensively the issue of whether

the Paxil evidence was admissible under Oregon evidentiary law.

This claim fails to show deficient performance by appellate counsel for two reasons.

First, appellate counsel does not have a constitutional duty to raise every non-frivolous issue

available in a case or requested by a defendant. *See* Jones v. Barnes, 463 U.S. 745, 751-54, 103

S.Ct. 3308 (1983). Thus the simple assertion that appellate counsel failed to appeal a meritorious

claim is, without more, insufficient to show constitutionally deficient performance under

Strickland. The weeding out of weaker issues is widely recognized as one of the hallmarks of

effective appellate advocacy. *See* Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989). As

discussed above, the PCR court could reasonably determine that appellate counsel's decision not

to raise this issue on appeal was a strategic choice based on his assessment of the claim's merit

after reviewing the state's motion *in limine* and supporting brief, the petitioner's brief in

opposition, and the trial court's letter opinion granting the state's motion to exclude the evidence.

While petitioner now maintains that the Paxil evidence was the single most critical issue on

appeal, this is not evident from the record. Moreover, as discussed below, there is no indication

that, had appellate counsel raised this issue on direct appeal, the outcome of petitioner's case

would have been any different.

Second, although petitioner 's claim is raised in the context of a denial of effective

assistance of appellate counsel, which is a constitutional violation properly subject to habeas

review, her argument turns on a question of state evidentiary law. That is, petitioner argues that

Page 21 - REPORT AND RECOMMENDATION

the trial court erred as a matter of law when it determined that the Paxil evidence was

inadmissible under Oregon's law of evidence, therefore, her appellate counsel's failure to raise

this issue on appeal constitutes deficient performance.  Petitioner has already presented this claim

to a state court: the PCR court.  The PCR court denied the petition, finding that petitioner had

failed to prove any grounds for post-conviction relief.  As <u>Richter</u> makes clear, where, as here,

the state court issues a summary dispositions unaccompanied by a written explanation of the

reasoning for the decision, the petitioner's claim is presumed to be adjudicated on the merits

absent any indication to the contrary.  No such indication is apparent to the court, and petitioner

offers none.  Thus petitioner's claim that the trial court erred as a matter of state evidentiary law

by excluding the Paxil evidence has been considered and rejected by a state court and is,

therefore, beyond the purview of the court in this federal habeas proceeding.  *See* <u>Estelle v.</u>

<u>McGuire,</u> 502 U.S. 62, 67-68, 112 S.Ct. 475 (1991) (a federal habeas court cannot reexamine a

state court's interpretation and application of state law); <u>Walton v. Arizona,</u> 497 U.S. 639, 653,

110 S.Ct. 3047 (1990) (it is presumed that the state knew and correctly applied state law),

*overruled on other grounds by* <u>Ring v. Arizona,</u> 536 U.S. 584, 122 S.Ct. 2428 (2002); <u>Engle v.</u>

<u>Isaac,</u> 456 U.S. 107, 119, 102 S.Ct. 1558 (1982) (challenging the correctness of the application of

state law does not allege a deprivation of federal rights sufficient for habeas relief).  This is

particularly true given that the state PCR court's decision has been affirmed by the Oregon Court

of Appeals, and the Oregon Supreme denied review.  *See* <u>Bradshaw v. Richey,</u> 546 U.S. 74, 76,

126 S.Ct. 602 (2005) ("A state court's determination of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); <u>Hicks</u>

<u>v. Felock,</u> 485 U.S. 624, 629-30 & n. 3, 108 S.Ct. 1423 (state appellate court's determination of

Page 22 - REPORT AND RECOMMENDATION

state law is binding and must be given deference); West v. AT & T, 311 U.S. 223, 237, 61 S.Ct. 179 (1940) (holding that federal courts must defer to an intermediate state court's interpretation of state law, made in the very case under consideration, when the highest state court has refused to review the lower court's decision); Shannon v. Newland, 410 F.3d 1083, 1087 (9th Cir. 2005) (same). As the state courts have determined that the trial court did not err by excluding the Paxil evidence, appellate counsel cannot be judged to have rendered ineffective assistance by failing to raise that issue on appeal, therefore petitioner's claim fails.

Finally, even if the court were to reach the issue on the merits, the court finds that the state court's determination that the Paxil evidence was inadmissible is supported by the facts of this case and Oregon law. Under Oregon law, "scientific evidence is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403." State v. Perry, 347 Or. 110, 121, 218 P.3d 95 (2009) (citing State v. Brown, 297 Or. 404, 687 P.2d 751 (1984); State v. O'Key, 321 Or. 285, 899 P.2d 663 (1995)). "Underpinning the entire admissibility analysis, however, is the requirement that the evidence be shown to be scientifically valid." Id. (citing Marcum v. Adventist Health System/West, 345 Or. 237, 245, 193 P.3d 1 (2008)). "Scientific validity, in turn, focuses the validity of the underlying scientific process--that is, the reliability of the methods and procedures utilized to produce the proffered evidence." State v. Helgeson, 220 Or. App. 285, 292,185 P.3d 545 (2008) (internal citations and quotation marks omitted). Rulings on the admissibility of "scientific" evidence are reviewed for errors of law. Id. at 290 (citing State v. Owens, 207 Or. App. 31, 37, 139 P.3d 984 (2006), rev. denied, 342 Or. 503, 155 P.3d 874 (2007)).

It is undisputed that petitioner's Paxil evidence is "scientific" evidence. As noted above,

Page 23 - REPORT AND RECOMMENDATION

petitioner proposed to introduce the Paxil evidence through the expert testimony of Dr. Robert

Julien, M.D., Ph.D.  At the pretrial hearing on the state's motion to exclude the Paxil evidence,

Dr. Julien's testimony established that Paxil is a trademarked drug within a class of drugs referred

to as serotonin specific reuptake inhibitors, or "SSRIs," and that the drug functions by blocking

the reuptake of serotonin at the serotonin receptor on postsynaptic neurones in the brain.

((12/17/01 PTH Tr. at pp. 4-5).  He further testified that the function of serotonin, generally, is to

maintain normal emotional states in the human body.  (Id. at pp. 6).  He testified that he did not

prescribe SSRI medications, but that, based on his analysis of the literature in the field, the

medications are statistically of therapeutic benefit to at least three groups of patients:  patients

with depression, patients with dysthymia, and patients with anxiety disorders.  (Id. at pp. 7).

Dr. Julien testified that his analysis of the literature revealed that when patients take

"excessive" amounts of their SSRI medications early in therapy, a "well described phenomenon"

called "serotonin syndrome" could result, where patients present with "extreme anxiety,

insomnia, feeling totally out of control and basically feeling that they're losing it," an almost

hallucinogenic reaction but typically including "frank hallucinations."  (Id. at pp. 9).

Pharmacologic literature also described a much more uncommon and less frequent reaction in

some patients of apathy, detachment, sometimes extreme, particularly when taking the

fluvoxamine and fluoxetine SSRI medications.  (Id. at pp. 9-10).  He further testified that rare

instances of violence had been reported in non-medically peer reviewed situations, primarily in

the context of civil litigation, and that these reports were "difficult for [him] to medically

quantitate."  (Id. at pp. 10).  Dr. Julien testified that while Paxil, whose chemical name is

paroxetine, (id. at pp. 8), was not included among the medications taken by the patients reporting

Page 24 - REPORT AND RECOMMENDATION

these symptoms, he "would expect that what applies to one [SSRI medication] applies to all." (Id. at pp. 10-11).

Dr. Julien opined that petitioner was "an extremely disturbed individual who would have had a somewhat unpredictable response to [Paxil]" and that in his opinion "given enough situational distress that rapidly increasing blood levels could cause bizarre and unpredictable responses," which he described as "agitation, irritability, confusion." (Id. at pp. 13). Dr. Julien based his assessment that petitioner was "extremely disturbed" on his review of Dr. Scherr's report, incomplete excerpts from police reports from the day of the shooting, and petitioner's "case history and [] medical reports," concluding that petitioner suffered from PTSD, major depressive disorder, generalized anxiety disorder, borderline personality disorder, and had a history of substance abuse. (Id. at pp. 12). Dr. Julien testified he could not say "with any degree of medical certainty" the extent to which Paxil would have affected petitioner's emotional state, and further testified that he in making a clinical judgment he would rely on "more respected and published" authorities than the articles reporting the uncommon side effects of SSRIs, but would not "ignore" those sources. (Id. at pp. 13-14).

On cross examination, Dr. Julien acknowledged that he was neither a psychiatrist nor a psychologist, that he had no experience in either of those fields, or in prescribing Paxil, Prozac, or other SSRI medications or otherwise treating patients in the context of psychiatric or psychological care. (Id. at 19). He admitted he was unaware of petitioner's history of violent outbursts and that he had never met with petitioner. (Id. at pp. 22). He conceded that SSRIs generally reduce anxiety and suicidal tendencies, and that peer reviewed clinical studies do not support the conclusion that SSRIs increase aggression. (Id. at pp. 20-21). Dr. Julien testified that

Page 25 - REPORT AND RECOMMENDATION

in his estimation, the anecdotal reporting of intense, violent suicidal preoccupation involving patients on Prozac would affect less than one percent of the population. (Id. at pp. 23). He further testified that the published study of patients reporting apathy and detachment while taking prescribed fluvoxamine and fluoxetine involved "a handful of case studies" involved patients taking "reasonably high doses" of up to 300 milligrams per day, and that he was unable to opine whether these patients had been suffering from serotonin syndrome. (Id. at pp. 24). Another source, the Preda study, involved a consecutive psychiatric admission study of patients whose diagnosed mania or psychosis, typically bipolar disorder, was reportedly precipitated by ingestion of relatively high doses of SSRIs, typically in combination with other antipsychotic medications. (Id. at pp. 25-28). Dr. Julien testified that neither study was able to establish any definitive causal link between ingestion of an SSRI and the occurrence of the reported side effects. Dr. Julien further testified that in his opinion a person who had taken prescribed SSRI medication without incident in the past would be less likely to manifest any unusual side effects such as serotonin syndrome, apathy, detachment, or violence; and further conceded that there was no scientific test available to test a person's susceptibility to these reactions. (Id. at pp. 40-41). Ultimately, Dr. Julien testified that he had no opinion as to whether petitioner was acting based on some adverse effect caused by Paxil at the time of the shooting, and that even if he was provided definitive evidence that petitioner had Paxil in her system, he would at most be able to offer a correlation between behavior and ingestion of the drug, but could not opine as to cause and effect. (Id. at pp. 46).

Petitioner also testified at the pretrial hearing. She testified that she was prescribed Paxil for depression in December of 1999, but did not fill the prescription until January of 2000, and

Page 26 - REPORT AND RECOMMENDATION

did not start taking the medication until February 14, 2000. (Id. at pp. 50). She testified that she took half a pill (20 milligrams) at night for a week, then a full pill each night the following week, and finally took two whole pills the night before the shooting; however, when confronted with the fact that there were not enough pills missing for that count to be accurate, petitioner stated she was not always good at remembering to take the medication and the only thing she could recall with certainty was that she took two whole pills for the first time the night before the shooting. (Id. at pp. 51-52).

The evidence presented to the trial can be summarized as follows: (1) Paxil is an SSRI medication; (2) the generally accepted medical evidence shows that SSRI medications have a medically therapeutic effect, reducing anxiety and suicidal ideation; (3) patients who take excessive amounts of SSRI medications may experience "serotonin syndrome," resulting in anxiety, insomnia, and feelings of being "out of it" or out of control; (4) a very limited number of patients reportedly experiencing "serotonin syndrome" have reported feelings of apathy and detachment, sometimes severe; (5) there are rare instances of non-medical, non-peer reviewed anecdotal reports of patients on Prozac experiencing intense, violent suicidal preoccupation; (6) these reports are "difficult to medically quantitate" but likely affect less than one percent of the population; (7) petitioner's own expert would rely on "more respected and published" authorities when rendering a clinical opinion; (8) it is not possible to test a person to determine susceptibility to serotonin syndrome or any other alleged negative effect of SSRI medications; and (9) it is not possible to establish any definitive causal link between the use of SSRI medications and the occurrence of the reported side effects; at most, a doctor can speculate that a causal connection is "possible."

The argument that SSRI medications cause negative effects can be divided into the argument that (1) SSRI medications cause serotonin syndrome and (2) SSRI medications may cause violent suicidal behavior. The second argument regarding violent behavior is clearly controversial, contrary to the weight of the medical evidence, and unsupported by any scientifically peer reviewed study. The first argument, while more generally accepted, is nevertheless controversial due to the wide range of reactions reported and the unpredictability of their occurrence.

The trial court found dispositive the lack of scientifically peer reviewed studies and the lack of any scientifically validated causal connection between the alleged cause and symptom. Even petitioner's own expert declined to rely on the reports which petitioner argues are admissible scientific evidence, testifying that he would rely on more established authorities in forming a clinical opinion. The trial court found that Dr. Julien's opinion that it was "possible" that Paxil might have affected petitioner to be insufficient to establish that the evidence satisfied the standard for scientific evidence, and this court cannot disagree with that assessment. As this issue was presented to the PCR court, which found no grounds for relief in a decision affirmed by the Oregon Court of Appeals and which the Oregon Supreme Court declined to review, it appears clear to this court that the trial court's judgment was found to be sound and not legal error.

For the reasons stated above, the PCR court could reasonably determine that appellate counsel's performance was not deficient under Strickland.

//

//

### 2. The PCR Court Could Reasonably Determine That Petitioner Cannot Show Prejudice

Petitioner argues that her appellate counsel's failure to appeal the exclusion of the Paxil evidence caused her prejudice because "there were several points on which an effective appellate advocate could have obtained a reversal," then refers back to her argument regarding the merit of the claim set out in the portion of her brief addressing why appellate counsel's failure to raise the issue on appeal constitutes deficient performance. (Pet'r's Br. iso Am. Pet. at pp. 22-23). As discussed above, petitioner's argument rests on a question of state law which has been presented to and decided on the merits by a state court, therefore it is beyond the purview of this court in a federal habeas proceeding.

Even if the court were to reach the merit of petitioner's argument, she has failed to satisfy her burden of proof as to prejudice. Petitioner argues that <u>Strickland</u>'s "reasonable probability" standard is satisfied by a showing that "her chances for success were 'better than negligible.'" (Pet'r's Br. iso Am Pet. at pp. 22-23). This significantly misstates petitioner's burden. As interpreted by the Supreme Court, "[t]he difference between <u>Strickland</u>'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." <u>Richter</u>, 131 S.Ct. at 792 (*citing* <u>Strickland</u>, 466 U.S. at 693, 697) (internal quotation marks omitted). "The likelihood of a different result must be substantial, not just conceivable." <u>Id.</u>

Although the trial court granted the motion and excluded the Paxil evidence, there were repeated references to petitioner's use of Paxil prior to and near the date of the shooting. Dr. Hulteng testified that petitioner did not talk to him about using Paxil until his third interview with her, during which she also changed her account of the shooting from being accidental to being intentional but committed under extreme emotional distress. (T. Tr. Vol. III, pp. 295). Dr.

Page 29 - REPORT AND RECOMMENDATION

Scherr similarly reported that petitioner did not mention her use of Paxil to him in her initial interview, but later reported taking Paxil and feeling "some distress" but did not clearly indicate whether she attributed that distress to the medication. (T. Tr. Vol. IV, pp. 416). Dr. Hulteng also testified that petitioner, who he found to be of above average intelligence with a full scale IQ of 110, told him she had not had any suicidal urges until taking Paxil and that she had been researching the drug. (T. Tr. Vol. III, pp. 309). On cross-examination Dr. Hulteng read into evidence that part of his report, where he recorded that petitioner stated the Paxil made her confused, unable to concentrate, and cold and unresponsive towards her children, but that she continued taking the Paxil anyway and was not able to separate her reaction to the divorce from the effects of the Paxil, and that she had since "done a lot of research on Paxil." (Id. at pp. 322-23). Evidence was introduced that in June of 1998, petitioner reported depression, insomnia, fatigue, difficulty concentrating, and anger management problems, and was prescribed Prozac based on her medical record which showed she had successfully been treated for depression with Prozac in 1996, and had previously been treated for depression with Paxil in December of 1994 and February of 1993. (Id. at pp. 325-28).

Taken together with Dr. Julien's testimony at the pretrial hearing, the court finds that petitioner has failed to prove a substantial likelihood that, had she been allowed to present the Paxil evidence, the outcome of her trial would have been different. There is the initial difficulty that petitioner's consumption of Paxil cannot be verified; this is a credibility determination to be made by the factfinder. The fact that petitioner did not report her use of Paxil to Dr. Hulteng or Dr. Scherr until the last interviews, shortly before trial, and that this additional detail was added after petitioner changed her account from an accidental shooting to an intentional shooting

Page 30 - REPORT AND RECOMMENDATION

committed under an extreme emotional disturbance could raise some concern regarding the veracity of her story, particularly in light of her admission that she had been researching the effects of the drug. Controverted evidence was also submitted, in the form of testimonial evidence from inmates who had spent time with petitioner during her incarceration, that petitioner admitted to falsely fabricating her account that the Paxil negatively affected her after researching the SSRI medications and becoming aware of some of the controversial literature discussed by Dr. Julien. (T. Tr. Vol. V, pp. 670-72; 680-81). Combined with the testimony that petitioner had once submitted a false report of abuse in order to secure a restraining order against her husband, it is questionable whether her testimony regarding the negative effects she suffered as the result of taking Paxil would have been found credible.

The credibility of these assertions is even more doubtful in light of petitioner's own medical records, which showed she had been successfully treated for depression with Paxil in 1993 and 1994, and with Prozac in 1996 and 1998. According to petitioner's own expert, Dr. Julien, the fact that she had been treated without incident with SSRI medications in the past would make it less probable, although not impossible, that her use of Paxil in 2000 would cause her to suffer any negative reaction, let alone a violent one. Had Dr. Julien been confronted with this evidence, along with the evidence of petitioners difficulty with anger and past violent behavior in the relationship with her husband and in previous intimate relationships, it is far from clear what Dr. Julien's testimony would be as to his opinion of the effect Paxil had on petitioner.

Finally, the probative value of the Paxil evidence is highly questionable. At the pretrial hearing, Dr. Julien would only go so far as to say that it was possible that the use of Paxil could have affected petitioner on the day of the shooting. He made this statement without the benefit

of the opinions of Drs. Kolbell and Hulteng and without the knowledge of petitioner's past SSRI use. Drs. Scherr, Kolbell, and Hulteng, who commonly interact with persons having mental health issues comparable to petitioner and who regularly prescribe SSRI medications as part of their treatment for these conditions, could also have been called on to testify as to their experience as practicing psychologists and psychiatrists as to their observations of the effects of these medications.

Considering the weight of the evidence, it appears to the court that while petitioner currently maintains that the Paxil evidence was critical to her EED defense, the reality is that the Paxil evidence was merely critical to the *theory* of her EED defense. In light of all of the other evidence presented and the uncertain, speculative nature of both the possible effect that Paxil may have had on petitioner, if indeed she was found credible in her account of her consumption of it, the court is unable to discern any significant weight that the evidence would have had in the determination of whether she had proved the elements of the EED defense. Therefore, the court finds that the PCR court could reasonably determine that petitioner failed to demonstrate prejudice under <u>Strickland</u>.

**II. Ground Two**

Petitioner argues that under Oregon law, the Paxil evidence satisfied the threshold requirement of admissibility for scientific evidence, thus the trial court's exclusion of that evidence was arbitrary and deprived her of her constitutional right to put on a defense. (Brief iso Am. Pet. at pp. 25-26). Petitioner acknowledges that this claim is procedurally defaulted, (id. at 26), but argues that default is excused under the "cause and prejudice" standard, asserting that the ineffective assistance of her appellate counsel constitutes cause and reiterating her arguments

from Ground One as to prejudice, (id. at pp. 27-28).

Respondent counters with two arguments. First, respondent argues that the procedural default of plaintiff's second claim for relief occurred at the trial stage, when petitioner's trial counsel failed to object to the exclusion of the evidence on the constitutional grounds she now attempts to raise. (Reply to Pet. Br. iso Am. Pet. at pp.7). Even if petitioner's appellate counsel had raised this issue on direct appeal, the Oregon Court of Appeals was not *required* to consider the claim, but rather merely had the *discretion* to consider the unpreserved claim, provided that the court first found that the claim fell within the plain error exception. (Id.). Thus, even if plaintiff's appellate counsel *had* raised the issue on direct appeal, it would not be preserved for federal habeas review, because a claim raised for the first time on petition for discretionary review does not satisfy the "fair presentation" requirement. (Id.).

Second, respondent argues that in order for ineffective assistance of counsel to serve as "cause" to excuse procedural default, the ineffective assistance claim must itself be exhausted. (Id. at pp. 7-9). Because petitioner has never presented a claim in state court for ineffective assistance of counsel based on the constitutional error she now alleges, the claim is *itself* procedurally defaulted and may not serve as "cause" to excuse procedural default for any other claim. (Id.).

## A.    Ground Two Is Procedurally Barred

### 1.  Exhaustion and Procedural Default

A federal court may not grant a petition for writ of habeas corpus unless the petitioner has exhausted the state remedies available to her. 28 U.S.C. § 2254(b); Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546 (1991). This requirement affords state courts "the opportunity to

Page 33 - REPORT AND RECOMMENDATION

pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541

U.S. 27, 29, 124 S.Ct. 1347 (2004) (internal citation and quotation marks omitted). State court

remedies are described as being "exhausted" when they are no longer available, regardless of the

reason for their unavailability. See Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074

(1996). Proper exhaustion requires that the petitioner give the state courts a "fair opportunity" to

act on each claim before the petitioner presents those claims in a federal habeas petition.

O'Sullivan v. Boerckel, 526 U.S. 838, 844, 119 S.Ct. 1728 (1999); Kelly v. Small, 315 F.3d

1063, 1068 & n. 2 (9th Cir.), cert. denied, 538 U.S. 1042, 123 S.Ct. 2094 (2003). A petitioner

fully and fairly presents a claim to the state court when she presents the claim: (1) in the proper

forum; (2) through the proper vehicle; and (3) by providing the proper factual and legal basis for

the claim. Insyxiengmay v. Morgan, 403 F.3d 657, 668 (9th Cir. 2005) (citations omitted).

The doctrine of procedural default may apply to preclude federal review of a habeas

petitioner's claims in one of two ways. First, under the independent and adequate state ground

doctrine, a federal claim that was actually raised in state court but found by that court to be

defaulted on state procedural grounds such as waiver or preclusion is procedurally defaulted.

Yist v. Nunnemaker, 501 U.S. 797, 802-05, 111 S.Ct. 2590 (1991); Coleman, 501 U.S. at 729-

30. Second, where the petitioner failed to present her federal claim to the state court, and that

court's procedural rules would bar consideration of the previously unraised claims, the claim is

technically procedurally defaulted. Teague v. Lane, 489 U.S. 288, 297-99, 109 S.Ct. 1060

(1989); Beaty v. Stewart, 303 F.3d 975, 987 (9th Cir. 2002). In either case of procedural default,

federal review of the claim is barred unless the petitioner can show (1) cause and prejudice, or (2)

a fundamental miscarriage of justice (actual innocence). Dretke v. Haley, 541 U.S. 386, 393-94,

124 S.Ct. 1847 (2004); Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2678 (1986); Park v. Cal., 202 F.3d 1146, 1150 (9th Cir. 2000).

Petitioner acknowledges that she has not raised Ground Two in any previous state court proceeding, therefore the claim stated in Ground Two is procedurally defaulted. However, she argues that procedural default is excused because she can satisfy the "cause and prejudice" exception.[8]

### 2. Cause and Prejudice

The Supreme Court has not "identified with precision exactly what constitutes 'cause' to excuse a procedural default." Edwards v. Carpenter, 529 U.S. 446, 551 (2000) (internal citations omitted). "[T]he existence of cause for procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded [her] efforts to comply with the State's procedural rule." Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639 (1986). For cause to exist, the external impediment must have prevented the petitioner from raising the claim. See McCleskey v. Zant, 499 U.S. 467, 497 (1991). To demonstrate prejudice, it is insufficient that a petitioner show the mere possibility of prejudice; rather, the she must show that the error she alleges "worked to [her] actual and substantial disadvantage, infecting [the] entire [proceeding] with errors constitutional dimension. White v. Lewis, 874 F.2d 599, 603 (1989) (citing U.S. v. Frady, 456 U.S. 152, 170 (1982)). If the petitioner fails to show cause, the court need not consider whether the petitioner suffered actual prejudice. Engle v. Isaac, 456 U.S. 107, 134 n. 43 (1982); Roberts v. Arave, 847 F.2d 528, 530 n. 3 (9th Cir. 1998).

---

[8] The cause and prejudice test applies to procedural defaults on appeal. Murray v. Carrier, 477 U.S. 478, 489, 106 S.Ct. 2639 (1986).

Petitioner argues that, had her appellate counsel appealed the trial court's ruling on the motion *in limine* on Ground Two, the Oregon Court of Appeals would have identified the trial court's ruling as an improper application of Oregon law and reversed and remanded for a new trial. Presumably, petitioner contends that, with the benefit of the Paxil evidence, she would have prevailed in her EED defense in a new trial and therefore would only have been convicted at most of first degree manslaughter.

### (a) Petitioner Cannot Show Cause

While ineffective assistance of counsel may serve as cause for the procedural default of another federal claim, Edwards v. Carpenter, 529 U.S. 446, 451-53, 120 S.Ct. 1587 (2000), the court has, as discussed at length above, determined that appellate counsel was not ineffective in failing to raise the exclusion of the Paxil evidence on appeal.

### (b) Petitioner Cannot Show Prejudice

Petitioner's case does not fall into one of the three categories where prejudice is presumed, therefore she must overcome the strong presumption of the reliability of judicial proceedings. *See* Smith v. Robbins, 528 U.S. 259, 286-87, 120 S.Ct. 746 (2000).[9] "It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Kealohapauole v. Shimoda, 800 F.2d 1463, 1466 (9th Cir. 1986) (same). As described at length above, the court finds no indication

---

[9] Prejudice is presumed in three categories of cases: (1) when there has been a complete denial of counsel; (2) in cases of state interference with the assistance of counsel; and (3) when counsel is burdened by an actual conflict of interest. Smith v. Robbins, 528 U.S. 259, 286-87, 120 S.Ct. 746 (2000) (*citing* Strickland, 466 U.S. at 692).

Page 36 - REPORT AND RECOMMENDATION

that petitioner suffered any prejudice at all, let alone prejudice of such magnitude as to render her trial fundamentally unfair.

### B.   Ground Two Fails On the Merits

Even if the court were to reach the merits of petitioner's claim that the exclusion of the Paxil evidence violated her Sixth and Fourteenth Amendment rights, her claim fails.

A criminal defendant has a constitutional right to present witnesses, testimony and other evidence in her defense which derives from both the Fourteenth Amendment right to due process and the Sixth Amendment right to compulsory process. Moses v. Payne, 555 F.3d 742, 756-57 (2009) (*citing* Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038 (1973) (14th Amendment); Washington v. Texas, 388 U.S. 14, 23, 87 S.Ct. 1920 (1967) (6th Amendment)). However, a criminal defendant's right to present evidence relevant to her defense is subject to reasonable restrictions such as evidentiary and procedural rules. Id. at 757 (*citing* U.S. v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261 (1998)). States have broad latitude to establish rules that allow trial courts discretion to exclude evidence whose probative value is outweighed by unfair prejudice, confusion of the issues, or which poses an undue risk of misleading the factfinder. Id. (*citing* Schefer, 523 U.S. at 308 and Holmes v. South Carolina, 547 U.S. 319, 326, 126 S.Ct. 1727 (2006)); *see also* Crane v. Kentucky, 476 U.S. 683, 689-90, 106 S.Ct. 2142 (1986). "Evidentiary rules do not violate a defendant's constitutional rights unless they infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Id. (*citing* Holmes, 547 U.S. at 324 (internal quotations omitted)). Generally, a criminal defendant seeking to prove that a rule is arbitrary or disproportionate to the purpose it serves must demonstrate the existence of "unusually compelling circumstances." Id.

Page 37 - REPORT AND RECOMMENDATION

(*citing* Perry v. Rushen, 713 F.2d 1447, 1452 (9th Cir. 1983)).

In Moses, the defendant was convicted of second degree murder for killing his wife, who died of a gunshot wound to the upper right side of her neck behind the ear. Id. at 746-50. The defendant maintained that his wife was severely depressed and that she committed suicide by shooting herself in the head while he struggled to get the gun away from her. Id. at 746. At trial, the defendant submitted evidence from several witnesses to show that the defendant's wife had suffered from severe depression and suicidal ideation in the days leading up to her death. Id. at 748-49. Among the evidence defendant attempted to submit was the expert testimony of a doctor regarding his opinion of the victim's mental state and suicide risk, based on the victim's mental health records, diary, and autopsy results, as well as his interviews with her friends and family. Id. at 749. The court excluded the evidence as cumulative in part, and lacking in probative value as to the remainder. Id. at 749. His conviction was affirmed by the state appellate court, and the state supreme court denied review. Id.

The defendant filed a petition for habeas relief pursuant to 28 U.S.C. § 2254(d)(1), arguing, among other things, that his right to present a defense was violated by the exclusion of the doctor's expert testimony. Id. at 756-57. His petition was denied and he appealed to the Ninth Circuit. With regard to the defendant's argument that the state court violated his constitutional right to present a defense by excluding the doctor's expert testimony, the Ninth Circuit found that habeas relief was unavailable because there is no clearly established Supreme Court law that addresses whether the application of a discretionary rule infringes upon a weighty interest of the accused or is arbitrary or disproportionate to the purpose which it is designed to serve, therefore the state appellate court's determination that the trial court's exclusion of the

expert testimony did not violate the defendant's constitutional rights could not be contrary to or an unreasonable application of clearly established Supreme Court precedent. Id. at 757-59.

Here, as in Moses, the state rule of evidence at issue governs the admissibility of expert testimony and required the court to balance a number of factors in order to determine whether to admit the evidence. In finding the evidence inadmissible under the state evidentiary rule, the trial court specifically considered petitioner's constitutional right to present a complete defense. (Resp. Ex. 118 at pp. 2-3). As in Moses, the exclusion of the evidence did not preclude petitioner from testifying or presenting other evidence in support of her defense. To the contrary, petitioner pursued her EED defense at trial and presented significant evidence in support of the defense, including the testimony of two doctors of her own choosing, who offered their diagnoses and opinions of petitioner's mental and emotional state on the day of the shooting, and petitioner's medical records, including her past and current use of SSRI medications. On this record, the court finds that the exclusion of the Paxil evidence did not violate petitioner's right to present a complete defense.

## CONCLUSION

For the reasons stated above, the petition for habeas relief should be denied and the action should be dismissed.

***This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.*** Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order.

The Report and Recommendation will be referred to a district judge. ***Objections to this***

Page 39 - REPORT AND RECOMMENDATION

*Report and Recommendation, if any, are due by May 9, 2011. If objections are filed, any*

*response to the objections are due by May 26, 2011. See* FED. R. CIV. P. 72, 6.

DATED this _____ day of April, 2011.

MARK D. CLARKE
United States Magistrate Judge

Page 40 - REPORT AND RECOMMENDATION